CASE No. 1058.

SHULER v. BULL.

1. The principle expressed in the maxim *pater est quem nuptiæ demonstrant* should have full influence, but the question of the paternity of a child born in wedlock is one of fact to be determined upon competent evidence, and such evidence is not limited to the proof of impossibility of access.

2. Personal property was bequeathed by will to the executors to hold in trust for the use of A during life, and after her death to be equally divided among her children. *Held*, a vested remainder in the children.

3. A release of a child's share in such vested remainder, executed by her husband in 1867, was effectual to release the wife's interest upon the falling in of the life-estate in 1874, both husband and wife surviving. *Cases reviewed.*

4. The constitutional provision, giving the property of a married woman to her as her separate estate, did not affect the marital rights of the husband, vested and exercised before the adoption of the constitution, in 1868.

Before THOMSON, J., Orangeburg, May, 1880.

Action commenced September 9th, 1874, by Zipporah R. Shuler, against William H. Bull and Waring Bull. Pending suit Waring Bull died, and the action was continued against W. H. Bull alone. The nature of the plaintiff's claim and of the defences are stated in the opinion. The release relied on by defendant was executed in 1867, during the pendency of a suit instituted in the Court of Equity in 1866, by Lincey M. Burkett, Dorcas E. Griffin, D. G. B. Shuler and Z. R. Shuler, his wife, against William H. Bull and Waring A. Bull, executors and trustees under the will of William Bull, deceased, for account, payment of interest, &c. This release was as follows:

Know all men by these presents: That we, Lincey M. Burkett, Dorcas E. Griffin, David G. B. Shuler, and Zipporah R., his wife, do hereby release and forever discharge William H. Bull and Waring A. Bull from all liabilities, debts, claims or actions or suits at law or in equity, which he is under or liable to us, or either of us, by reason of any bequest or legacy to Lincey M. Burkett and her children, under the will of William Bull, the father of the said Lincey M. Burkett and William H.

Bull, of which the said William H. Bull and Waring A. Bull were the executors and trustees, or by reason of any receipts by them received, or payments or investments by them made in regard to the same from the beginning of the world to the date of these presents.

Witness our hands and seals this fourteenth day of January, anno domini one thousand eight hundred and sixty-seven.

LINCY M. BURKETT. [L. S.]
DORCAS E. GRIFFIN. [L. S.]
DAVID G. B. SHULER. [L. S.]
ZIPPORAH R. SHULER. [L. S.]

It was duly witnessed. D. G. B. Shuler and his wife, Zipporah, both survived Lincey M. Burkett, who died in August, 1874. Other facts are stated in the opinion.

The Circuit decree was as follows :

These questions, in order, are : The illegitimacy of the plaintiff, the alleged investment of the funds in Confederate securities, and the release. The defendant excepts, because, as he alleges, the testimony proves the illegitimacy of the plaintiff, and that the referee erred in not finding *that* as a fact. The referee does not, in words, say that he regarded the plaintiff legitimate ; but unless he is of opinion that an illegitimate child of Lincey M. Burkett could take under the terms of the will, he must have regarded the plaintiff legitimate to reach his conclusion of law.

The referee has found as a fact that Lincey M. Burkett was living with Andrew Keller when the plaintiff was born. There is proof that Z. Burkett was in the country, and was living after plaintiff's birth. The relations of Andrew Keller and Lincey M. Burkett were such that he may be—the court may go further and say he was, probably—the father of the plaintiff. The proof, however, upon a question of this kind, is peculiar. To bastardize the issue of a married woman, non-access of the husband must be proved. Proof of probable paternity by another man than the husband is not enough. In a word, the question is not so much who is the father of the child, as, could the husband have had access to the wife. Reasons of policy, public decency, and the peace of families, require the observance of the principle, "*Pater est quem nuptiæ demonstrant.*" The usual

proof adduced to overcome this presumption is the absence of the husband beyond the seas, or of facts showing that the husband could not have been the father of the child.

There is no question as to the paternity of Lincey M. Burkett's eldest child; and the evidence impresses the court that fidelity in these relations was not a marked characteristic of Lincey M. Burkett.

Is the proof of non-access of the husband so complete that Z. Burkett could not have been the father of the plaintiff? Though undoubtedly strong, the proof does not seem of that conclusive kind required in these cases—proof that there could not have been access of the husband. Upon this point the court concurs in the conclusion of the referee, that the plaintiff takes under the will as a child of Lincey M. Burkett.

The plaintiff, when she executed the release, was a married woman, though of age. Her interest was a remainder, to take effect in possession upon her mother's death. To make this transaction valid, her interest should have been assigned or released through the intervention of the court.

Giving effect, however, to the release as an act of her husband, with what has she parted? May she not yet claim a settlement? This she can do until her husband reduces her expectant legacy into possession. The husband cannot transfer a greater interest than his own. He has never reduced the legacy to possession, nor could he during the life-estate.

The executors were aware of the wife's rights; indeed, they were trustees to preserve her rights until division was made according to the will. Whatever interest the husband had, they may have, but no more. But the relation of trustee and *cestui que trust* existed between the plaintiff and defendant. This required on the part of the trustee the utmost fairness of dealing in a settlement, and especially when the transaction was with one who had but lately attained her age. The circumstances under which the release was given, what knowledge of her rights was communicated to the plaintiff, the consideration of the release, how much, if paid, are not clear, and strengthen the plaintiff's statement that she did not have full information to which, in such a settlement, she was entitled. The court concurs in

the conclusion of the referee, that the release is no defence or bar to the suit.

In directing the payment of a specific sum of money, the referee went too far. The plaintiff seeks equity, and must do it. An account must be taken, and in taking the account, whatever sum she received from the executors at the time the release was given, must be included as a credit; but not money received by her husband. So, too, the question of investments in Confederate securities must be considered, and any payment legally made by the executors for the plaintiff connected with the legacy.

*It is ordered, adjudged and decreed:* That the exceptions to the referee's report upon the defences of illegitimacy and the release be overruled. That the exception as to an account be sustained, and that it be referred to T. B. Whaley, Esq., as special referee to take an account between the parties, including in the accounting any money or payment received by the plaintiff connected with her release, but not money received by her husband; that he consider the question of alleged investments by the executors in Confederate securities, and also take in the accounting any payments made by the executors to the plaintiff connected with the legacy. That, if need be, he summon witnesses and take testimony in reference to the said matters, and make his report of actions to this court.

Defendant appealed.

*Mr. W. J. De Treville,** for appellant.

The evidence shows that the plaintiff was illegitimate, and the old rule declared by the Circuit decree is exploded. The modern doctrine is that there is a presumption of legitimacy, but it may be rebutted by proof. 1 *Phil. on Evid.* (*4th Am. ed.*) 630; 3 *Id.* 600; 2 *Greenl. on Evid.*, § 150; *Reeve Dom. Rel.* 271; 2 *Whart. on Evid.*, §§ 1, 298–300; 1 *S. C.* 87; 5 *Car. & P.* 604; 4 *T. R.* 356; 1 *Sim. & Stu.* 150, 153; 8 *East* 193; 1 *Strange* 52; 2 *Id.* 925, 1076; 13 *Ves.* 58; *Tyler on Inf. & Cov.* 233. As to release. The signature of the husband bound both himself and

---

* Here, as elsewhere, points not decided by the court, are omitted, as also the authorities cited to sustain them.—*Reporter.*

wife. 2 *Rich.* 331; *Clan. on Husb. & W.* 110; 2 *Chit. on Cont.* 1149; *Com. Dig.*, " *Release*," E ; *Shep. Touch.* 333 ; 1 *Salk.* 326 ; 12 *Ves.* 473. If plaintiff took at all she took a vested interest, assignable by her husband. 1 *Rich. Eq.* 78 ; 2 *Jarm. on Wills* (*5th Am. ed.*) 459 ; 2 *Brown's Ch.* 75 ; 1 *Russ.* 220 ; 4 *Rich. Eq.* 276 ; 1 *Roper on Husb. & W.* 227, 237 ; 2 *Kent* 135 ; 2 *McC. Ch.* 372.

The right which the husband had in 1867 could not be divested by the constitution of 1868. *Wells Sep. Prop. Mar. W.,* §§ 13–24 ; 2 *Kern.* 207 ; 3 *Id.* 288 ; 101 *Mass.* 339 ; 1 *Bay* 252 ; *Potter Dwar.* 162–166 ; 15 *Wall.* 623 ; 16 *Id.* 317 ; 11 *S. C.* 71 ; 4 *Wheat.* 518 ; 1 *How.* 311 ; 2 *How.* 608 ; 2 *Comst.* 245 ; 17 *Barb.* 160.

*Mr. M. J. Browning,* contra.

The presumption of legitimacy can be rebutted only by peculiar and satisfactory proof that the husband could not be the father. 5 *Coke* 989 ; 2 *Best on Evid.* 625 ; 1 *Sim. & Stu.* 153 ; 10 *Rich.* 66 ; 1 *Desaus.* 595. The release is void because plaintiff was a married woman, and her husband could not assign or release her interest. 5 *Rich. Eq.* 566 ; 10 *Rich. Eq.* 387 ; 2 *Hill Ch.* 63 ; 1 *Story Eq. Jur.* 191–2, 204–233 ; 1 *S. C.* 435 ; 2 *Bay* 112 ; 14 *Rich. Eq.* 27 ; 1 *N. & McC.* 37 ; 6 *S. C.* 19 ; 2 *Story Eq.,* § 1413 ; 1 *Russ.* 1 ; 3 *Id.* 65.

*Mr. S. Dibble* in reply.

July 18th, 1881. The opinion of the court was delivered by SIMPSON, C. J. William Bull died in 1852, leaving by will a legacy amounting to $1704 in the hands of his executors, the defendants, W. H. Bull and Waring A. Bull, (the latter of whom has since died,) in trust for the use of his daughter, Lincey M. Burkett, during her natural life, and after her death to be equally divided among her children. The interest on this fund was regularly paid to Mrs. Burkett during her life. She died in August, 1874, leaving the plaintiff and another daughter, Dorcas, surviving her.

In September, after her death, the plaintiff instituted this ac-

tion against the defendant to recover this legacy, claiming to be a child of the said Lincey. The defendant answered the complaint with a general denial as a first defence, and pleading as a second defence a written release signed by Lincey M. Burkett, Dorcas E. Griffin, David B. Shuler and the plaintiff, his wife, Zipporah R. Shuler, dated January 14th, 1867, under seal, a copy of which will be found in the " case."

The cause at this stage was referred to T. B. Whaley, Esq., as special referee, " to hear and determine the issues therein."

The referee found as matter of fact: 1. " That the sum of $1704 came into the hands of the executors of William Bull, as alleged in the complaint.

2. " That Lincey M. Burkett, the life tenant, died August 12th, 1874, leaving two children, Dorcas E. Griffin and the plaintiff surviving her.

3. " That the plaintiff was born in 1843 while her mother lived with one Andrew Keller on the premises of F. N. Hart.

4. " That the plaintiff united with her husband, sister and mother in the execution of the release, but without due information or knowledge of her rights.

5. " That Waring A. Bull died since the commencement of this action."

He found as matter of law : 1. " That plaintiff is entitled to one moiety of the fund with interest, thereon from August 12th, 1874.

2. " That plaintiff is not bound or estopped by the release.

3. " He adjudged and ordered that defendant pay the plaintiff the sum of $1157.65 and the costs," submitting with his report the testimony.

To this report of the referee the defendant excepted, assigning as error : 1. That the referee did not report as to the investments by the executor of the trust funds in Confederate currency during the war.

2. That he did not report as to the legitimacy of the plaintiff; and

3. That he erred in reporting that plaintiff executed the release without due information and knowledge of her rights, and that she was not estopped thereby.

The cause, upon this report and exceptions, was heard by Judge Thomson at the May Term of the court for Orangeburg, 1880.

Judge Thomson decided that the exceptions of defendant as to the illegitimacy of plaintiff and as to the release be overruled, and that the case be remanded to the referee for an accounting between the parties ; upon which accounting he directed that the question of investment in Confederate currency by the executors be considered.

The defendant appealed from this decree upon the following grounds :

1. " Because his Honor erred in finding that plaintiff is the legitimate child of Lincey M. Burkett and entitled to take under the will of William Bull.

2. " Because his Honor erred in finding the release no defence or bar to the present action."

For the proper adjudication of the questions raised it is not necessary for this court to express any opinion as to the paternity of the plaintiff.

*Pater est quem nuptiæ demonstrant* is the general rule, and ordinarily, as was well said by Judge Thomson, " reasons of policy, public decency and the peace of families require the observance of this principle." But while this is true as a general rule, and was formerly adhered to with considerable strictness, yet it has undergone some change and relaxation, and now evidence may be introduced to overcome the presumption arising from marriage

Shakespeare in his drama of King John, act I., scene 1, gives us a trial before the Aula Regis, the king himself being present in person, Fitz-Peter being chief justiciar, in a " legitimacy case " as it was called, which involved the legitimacy of one who was said to be the illegitimate son of Richard Cœur de Lion. In that trial the doctrine *pater est quem*, subject, however, to the exception of the absence of the husband *extra quartuor maria*, was contended for, and Lady Fauconbridge having remained in England while her husband was employed in Germany, the defendant was found illegitimate, much stress being given to the testimony of Dowager Queen Eleanor, who declared that the defendant had a " trick of Cœur de Lion's face," and that " she read in his com-

position the token of her son, and she was sure that she was his grandame." So by the advice of Lord Chief Justice Fitz-Peter, judgment was given for the plaintiff, while the defendant, kneeling before the king, rose Sir Richard Plantaganet. *Lives of the Chief Justices vol. I., p.* 43.

Judge Thomson ruled as matter of law, in substance, that nothing short of proof of impossibility of access could overthrow the presumption arising from marriage, and he based his decree upon the fact that the evidence did not show that this impossibility existed in this case.

We think that Judge Thomson contracted the principle applicable to such cases within too narrow a boundary, and in endeavoring to solve correctly the delicate question of fact which was before him, he applied an incorrect principle of law. The law as it now stands is : That a question of paternity is in itself a question of fact, to be determined like any other question of fact—by testimony, the principle *pater est quem nuptiæ demonstrant* having its full influence, subject, however, to such competent evidence as in the judgment of the jury may be sufficient to overthrow it ; and this may be done by proof other than impossibility of access. It may be done by showing non-access, or any other facts which may satisfy the minds of the jury.

True, out of regard to the sacred interest involved in the marriage relation, the happiness and reputation of families, the character of children, and the public peace, evidence of this character should be watched with great care and admitted with great caution by the courts ; but such testimony is competent, and, when admitted, is entitled to be considered.

Judge Thomson in his decree said : " Is the proof of non-access of the husband so complete that Z. Burkett could not have been the father of the plaintiff ? Though undoubtedly strong, the proof does not seem of that conclusive kind required in such cases—*proof that there could not have been access of the husband.*" In the absence of this proof, and on account of its absence he found as matter of fact that plaintiff was legitimate.

In *State* v. *Shumpert,* 1 *S. C.* 87, Moses, C. J., quoting from 2 *Greenl. on Ev.* 125, said : " A child born during coverture is presumed to be legitimate ; proof of non-access, or any-

thing else which plainly shows that, in the course of nature, the husband could not be the father of the child, removes the force of this presumption. If the husband and wife had the opportunity of intercourse this merely strengthens the presumption of legitimacy." And, again, he says : " The rule is stated in clear terms in the answer of the Lord Chief Justice in the celebrated Banbury Peerage case, 1 *Sim. & Stu.*, 153, where he says : " That the fact of birth of a child from a woman united to a man by lawful wedlock is generally by the law of England *prima facie* evidence that such child is legitimate. That such *prima facie* evidence of legitimacy may always be lawfully rebutted by satisfactory evidence that such access did not take place between husband and wife as by the laws of nature is necessary in order for the man to be in fact the father of the child." The same doctrine is laid down in *Reeves Dom. Rel.*, 271 ; in *Phil. Evid.* 630, and in numerous decided cases in England.

Under the force of these authorities, without going into the question whether in this case the evidence was sufficient to establish the illegitimacy of the plaintiff, we think that Judge Thomson reached his conclusion upon this question of fact by the light of a principle which he incorrectly applied as a principle of law, and in' this respect that he erred.

The next question is as to the effect of the release. The referee found as matter of fact that the plaintiff executed the release without due information or knowledge of her rights. In this finding Judge Thomson concurred, and he held the release to be no defence or bar to this suit.

From the view which we take of this case it is not necessary to determine whether this finding is fully sustained by the weight of the evidence, or whether the evident preponderance is the other way. The release here was not only executed by the plaintiff, but it was also executed by her husband. They signed it at the same time. There is no evidence in the case, nor is there any finding either by the referee or the judge as to the information of the husband as to the matters intended to be settled by the release. In the absence of all proof on that subject we must take it for granted that he at least understood what he was doing, and while no judgment of the court, in his absence as a

party, will be conclusive upon him, yet his acts, unassailed, may bind others.

Now, what interest did the plaintiff take under the will of her grandfather in the legacy in question ? and what effect did the release, executed by her husband, with full understanding as to its purport and effect, have upon that interest ?

The will is not set out in the case, but in the complaint it is stated that William Bull died in 1852; that he directed, *inter alia*, that the legacy should be held by his executors in trust for the use of his daughter during her natural life, and after her death to be equally divided among her children. At the time of the execution of this will the plaintiff was near ten years of age; her sister, Dorcas, had also been born. The will was made, no doubt, with the knowledge of these facts on the part of this old man, and these grandchildren of his were in all probability especial objects of his bounty. They took a vested remainder in the legacy given to their mother for life. This vested remainder was in personal property, and the interest of the plaintiff was personal estate. To what extent did the marital rights of the husband attach to this interest, is the important question now to be considered. William Bull, the grandfather, died years before the adoption of the constitution of 1868. At that time the marital rights of the husband did not only attach to all personal property in the possession of the wife at the time of the marriage, but authorized him to reduce to possession all such as rested in action, or had not been reduced to possession by the wife.

The interest of the wife here was a chose in action, her title being complete, but the payment postponed to the death of her mother. In some respects it was like a note or bond, due at a future day. Did the husband have the right to assign or release this future payment upon a present consideration ? Was his assignment and release such a reduction to possession as his marital rights authorized and empowered him to make of the personal estate of his wife ?

At first, in this state, the right of the husband to assign the interests of the wife, not in possession, seemed to depend upon the fact whether the interest in question was vested or contin-

gent, using these terms in their technical sense. And it was said, in the case of *Terry* v. *Brunson*, 1 *Rich. Eq.* 78, "that a vested right of the wife may be effectually assigned by the husband, but her contingent interest will survive to her against his assignee, even though the assignment was made for a valuable consideration and with her concurrence." In *Larey* v. *Beazley* 9 *Rich. Eq.* 119, it was ruled "that where the wife has an expected interest in chattels, whether such interest be vested or contingent, legal or equitable, no act of the husband, or of any third person, investing the husband or wife, or both, with the present or particular estate, will operate to vest the future or expectant interest of the wife in her husband."

Other cases since have recognized this principle, but this does not touch the question here. It decides that there can be no merger of the remainder of the wife by the husband obtaining the particular estate upon which it depends. In such case the remainder will still exist as the right of the wife. But the doctrine of merger is not involved in this case.

In *Reese* v. *Holmes*, 5 *Rich. Eq.* 562, Chancellor Johnstone, who delivered the opinion in the case of *Terry* v. *Brunson*, *supra*, in a very elaborate and full discussion of all the cases upon this subject, both in England and in this state, it a circuit decree which was adopted as the opinion of the Appeal Court, announced the conclusion to be : " That neither the husband nor the wife alone, nor the husband and wife acting jointly, have the power during coverture, without the sanction of the court, to assign the wife's vested remainder in slaves expectant upon the termination of a life estate therein, so as to defeat the right of the wife to the remainder when it falls in, should the husband then be dead ; should the husband be alive when the remainder falls in, and he then have the right to reduce it to possession, his previous assignment will, it seems, hold good." Chancellor Johnstone, with that earnest desire always to be right, which was a beautiful and prominent trait in his character, and with that frankness which characterized all his judicial utterances, in the discusson of this case admitted that his language in the case of Terry *v.* Brunson had not been sufficiently guarded, and that his meaning was loosely and inaccurately expressed. He says that the words

*vested* and *contingent,* used in that case, were intended in the sense of *accrued* and yet to *accrue.*

In *Duke* v. *Palmer,* 10 *Rich. Eq.* 380, following the case of *Reese* v. *Holmes, supra,* it was held that where the wife has an expectant interest in chattels, though a transfer or concurrence in the transfer of her interest by herself and husband will not bind her if she be the survivor when the expectancy falls in, yet if, at that time, they both be living, and he be capable of reducing the expectancy to possession, they will both be bound by the transfer. This appears to be the law in this state, as held in several cases cited in *Reese* v. *Holmes* and *Duke* v. *Palmer, supra.*

Now, in this case the husband and wife were both alive at the falling in of the estate of the life tenant. Is there anything to prevent the principle held in these cases from applying? Section 8, Article XIV. of the constitution of 1868, in reference to the rights of married women, is relied upon. The life estate fell in after the adoption of the constitution, and it is contended that the plaintiff being at that time entitled to the possession of this legacy, and not until then, she was entitled to it free from the marital rights of her husband.

As we have seen, the interest of the plaintiff in the legacy was a vested remainder, the title to which passed to her at the death of her grandfather. It was in her when she married and during coverture. Upon this vested title the marital rights of her husband attached, at least so far as to give him the right to reduce the property into possession if it should fall in at any time during coverture; and in addition to this, as held in the cases of Reese v. Holmes and Duke v. Palmer, he had the right to contract with reference to this interest of his wife, whether it was a vested or contingent interest, subject to the peril only of his wife being the survivor at the time when this interest should fall in. This being so, to subject his contract now to a new condition and a new peril, by virtue of subsequent legislation, either by legislative enactments or constitutional provisions, would be in violation of well-established principles. A state can no more impair an existing contract by a constitutional provision than by an act

of the legislature—both are within the prohibition of the federal constitution. *Gunn* v. *Barry*, 15 *Wall.* 628. The law which exists at the time and place of making a contract enters into and forms a part of it. *Walker* v. *Whitehead*, 16 *Wall.* 317. True, it is said in both *Reese* v. *Holmes* and *Duke* v. *Palmer, supra*, that the validity of the assignment of the husband depends, not only upon both being alive when the expectancy falls in, but, also, that he shall then be capable of reducing this expectancy into possession.

The right to reduce to possession this expectancy was one of the rights embraced in the *jure mariti* when this plaintiff married. This right had vested in D. B. Shuler, the husband, before the adoption of the constitution of 1868. This capacity to act under this right attached and became complete upon the marriage. Now, without undertaking to speculate as to the manner in which this capacity might have been lost before the falling in of the expectancy, it is enough to say that in our opinion the constitution of 1868 did not, and could not legally create such incapacity. This would be divesting vested rights. We think that the release set up as a defence in this case having been executed by the husband, and there being no proof or allegation that he was without due knowledge and information, it should have been held as a bar to this action.

The judgment of this court is that the judgment of the Circuit Court be reversed.

McIver and McGowan, A. J.'s, concurred.